# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DAIGLE & ASSOCIATES, et al.,   )
                          )
       Plaintiffs         )
                          )
     v.                )     1:17-cv-00034-DBH
                          )
FARM FAMILY CASUALTY    )
INSURANCE COMPANY,      )
                          )
       Defendant      )

## RECOMMENDED DECISION ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff Daigle & Associates alleges that Defendant Farm Family Casualty Insurance Company unlawfully terminated payments required to be made to Plaintiffs pursuant to an extended earnings agreement. In its counterclaim, Defendant alleges Plaintiff and former plaintiff Andrew Daigle breached the agreement.[1]

The matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 35/44.) Through its motion, Defendant contends the undisputed facts establish that Plaintiffs breached the contractual provisions upon which the payments were conditioned, and, therefore, Plaintiffs are not entitled to the payments. Defendant also asks the Court to enter judgment on the liability issues in Defendant's counterclaim. [2]

---

[1] Plaintiff Daigle and Associates and Andrew Daigle will collectively be referred to as "Plaintiffs." After the filing of the complaint, Andrew Daigle passed away, and his claims were subsequently dismissed. Defendant maintains its counterclaim against Andrew Daigle.

[2] The parties stipulated to the dismissal of counts V through VIII of the complaint on February 15, 2018. (Stipulation of Dismissal, ECF No. 19.) In their response to the motion for summary judgment, Plaintiffs wrote, "Plaintiff hereby voluntarily dismisses all but count one of the Complaint at this time. Defendant

Following a review of the summary judgment record, and after consideration of the parties' arguments, I recommend the Court grant in part the motion.

<h2 align="center">BACKGROUND[3]</h2>

Defendant is a New York Corporation licensed to do business in the State of Maine. (Statement of Stipulated Material Facts, ECF No. 35-1, ¶ 1.) Andrew Daigle was at all relevant times an insurance agent licensed in Maine to sell insurance policies written by Defendant. (*Id.* ¶ 2.) Mr. Daigle began his relationship with Defendant as an insurance agent in 1988 and initially did business as a sole proprietorship under the business name "Andrew Daigle Insurance." (*Id.* ¶ 3.)

In the 1990s, Mr. Daigle's wife, Diane Daigle, became licensed to sell insurance in Maine and worked in the same office as Mr. Daigle. (*Id.* ¶ 4.) In 2002, Mr. and Mrs. Daigle formed A.D. Insurance, LLC, as part of an effort to facilitate relationships with insurers in addition to Defendant, and to offer types of insurance not offered by Defendant. (*Id.* ¶ 5.) At the formation of the company, Andrew and Diane Daigle were officers and members of A.D. Insurance, LLC. (*Id.* ¶ 6.) In 2009, Mr. Daigle formed a corporation known as Daigle & Associates. (*Id.* ¶ 7.) Mr. Daigle served as the president and Diane Daigle served as the vice president of Daigle & Associates. (*Id.* ¶ 8.)

---

does not object to this motion." (Response to Motion for Summary Judgment, ECF No. 41 at 11.) Based on the parties' agreement, I also recommend the Court grant Plaintiffs' motion to dismiss Counts II and III of the complaint.

[3] The facts set forth herein are derived from the parties' statements of stipulated material facts, as well as their Local Rule 56 statements of material facts, and are presented in the light most favorable to Plaintiffs.

Daigle & Associates and A.D. Insurance, LLC, shared one payroll account, and office space in a building located at 400 Main Street in Madawaska, Maine. (*Id.* ¶¶ 15, 17.) They also shared a customer service representative, telephone numbers, facsimile numbers, office supplies, and email addresses. (*Id.* ¶¶ 18 – 19.)

In July 2009, Defendant entered into a written Agent Contract with Daigle & Associates. (*Id.* ¶ 9.) Under the terms of the Agent Contract, Daigle & Associates and Andrew Daigle agreed to the following terms, which are material to the parties' dispute:

1. Daigle & Associates was required to provide Defendant with a "right of first refusal on all property and casualty insurance policies which [Daigle & Associates] may seek to place with any insurance company or broker during the term of this Agreement";

2. All insurance business placed with Defendant through Daigle & Associates was owned by Defendant and treated as part of Defendant's trade secrets;

3. Daigle & Associates was required to protect Defendant's proprietary and confidential information and, upon termination of the agreement, promptly surrender to Defendant all materials relating to Defendant;

4. Daigle & Associates was required, upon termination, to refrain from, directly or indirectly, contacting or soliciting any of Defendant's policyholders or customers for a period of two years after termination of the agreement and within a 50-mile radius of the Daigle & Associate's office;

5. Daigle & Associates was required to protect the privacy of Defendant's customer and policyholder information; and

6.       A failure or delay on the part of Defendant or Daigle & Associates to take action regarding a violation or to enforce its rights would not constitute a waiver of their ability to claim breach.

(*Id.* ¶¶ 10 – 11; Kubetz Dec. ¶ 7, Ex. 4.)

Under the agreement, Plaintiffs were entitled to certain commissions on Defendant's insurance business, including "Extended Earnings," which were periodic commissions following termination of the agreement. To be entitled to extended earnings commissions, Plaintiffs, i.e., the "Agent,"[4] were required to comply with the confidentiality and two-year noncompete clauses of the Agent Contract, along with certain additional terms and conditions in the Agent Commission Schedule for a period of eight years following termination of the agreement, which period coincided with the duration of the payment of the extended earnings commissions.

To be eligible for the extended earnings commissions, Plaintiffs could not "directly or indirectly contact or solicit any policyholder or customer … or induce or attempt to induce any policyholder or customer of [Defendant] … to cease doing business with the [Defendant] … or in any way interfere with the relationship between the Company … and any of their policyholders or customers;" nor "replace any policy or insurance product held by any policyholder or customer of [Defendant] with any similar policy or insurance

---

[4] The term "Agent" includes partners, owners, and officers of the Agent, if the Agent is a corporation.

product offered by another insurance company."[5]  (Statement of Stipulated Material Facts, ¶¶ 12 – 14.)

On October 20, 2014, in a letter to Daigle & Associates and Andrew Daigle, Defendant advised that due to the commingling of office space, employees, telephone numbers, and facsimile numbers, and the relationship between Daigle & Associates and A.D. Insurance, LLC, Defendant believed Daigle & Associates might be in violation of certain contractual obligations.  (*Id.* ¶ 20.)  The letter in part read:

> As an officer of Daigle & Associates, you are responsible for both your and the corporation's compliance under the Agent Contracts.  Our review of your and Daigle & Associates' relationship with A.D. Insurance, LLC indicates that certain contractual provisions may have been violated including: (1) the duty to protect proprietary and confidential information of the Insurers; (ii) the duty to protect the privacy of the Insurers' policyholders; (iii) the duty to ensure all sub producers and employees comply with the provisions of the Agent Contracts; and (iv) the obligation to obtain prior authorization before placing insurance business with companies other than the Insurers.

(*Id.* ¶ 21.)

Defendant instructed Plaintiffs to take the following corrective action or the Agent Contract would be terminated immediately:

a.  Andrew Daigle and Daigle & Associates confirm their intent to comply with all contractual obligations to Defendant;

b.  Maintain separation from A.D. Insurance, LLC;

c.  Establish separate and distinct telephone numbers, staff and personnel, computer servers, leases, e-mail accounts and separate email domains, different facsimile numbers, and different advertising;

---

[5] In the event a policyholder or customer located within 50 miles of the Daigle & Associate's residence and office contacted the agent after termination of the agreement, and requested replacement of one of Defendant's products, Daigle & Associates was required to refer the policyholder or customer to an existing agent of Defendant.  (Statement of Stipulated Material Facts, ¶ 14.)

d. Refrain from providing customer service to other insurance agencies, including A.D. Insurance, LLC;

e. Refrain from becoming an owner or, officer, partner, member, or stockholder of any other insurance agency, including A.D. Insurance LLC, unless authorized by Defendant;

f. Maintain separate business and premium trust bank accounts, as well as own professional liability policy; and

g. Refrain from referring clients to A.D. Insurance, LLC "even if the client has indicated that they are cancelling or non-renewing their policy with the [Defendant], are not satisfied with the price offered by the [Defendant], are declining to purchase insurance with the [Defendant], or are otherwise leaving [Defendant]."

(*Id.* ¶¶ 22, 23.) In 2014 and 2015, Plaintiffs undertook some measures to address Defendant's concerns. (Defendant's Statement of Material Facts, ECF No. 35-2, ¶ 14; Plaintiff's Opposing Statement of Material Facts, ECF No. 42, ¶ 14; E-mail exhibits to Plaintiff's Statement, ECF No. 41-1 through 42-11.)

On September 10, 2015, Andrew Daigle submitted to Defendant a letter of resignation on behalf of Daigle & Associates; the parties agree that the letter terminated the Agent Contract on September 30, 2015. (Statement of Stipulated Material Facts ¶ 24.)

On September 29, 2015, one day prior to the termination of the Agent Contract, in an email to Taylor Pelletier, a customer service representative who worked for both Daigle & Associates and A.D. Insurance, LLC, Mr. Daigle directed Ms. Pelletier to send a letter for the benefit of A.D. Insurance, LLC, to Defendant's clients and noted:

We want to be cordual [sic] and helpful to farm family clients. That way we might get more converted to a d ins from daigle & assoc. lots of people won't want to deal with an agency from presque isle. Even if new carrier is more

expensive we might rewrite them. Tomorrow at least nic will be back. I'll get you money for stamps one way or another.

(*Id.* ¶ 26.)

In a September 28, 2015, email to Ms. Pelletier, Mr. Daigle wrote the following regarding the letter to Defendant's clients:

Hi tay, here's the letter that a.d. ins. wants to send out. double check my spelling and grammar but should be pretty close to 100% double check list to files any questions let me know. If more envelopes needed just go to kmart against [sic] this is on a.d. letterhead. Should also possible look at double spacing line and wide margins to better fill space on letter.

(*Id.* ¶ 27.)

At Mr. Daigle's direction, the following letter was sent to some of Defendant's customers:

Dear Farm Family Clients,

This letter is being sent to let you know that even though Andy will be retiring from Farm Family Insurance Co. at the end of September, the office and agency will remain open for all non-Farm Family policies and insurance needs. We represent many fine insurance carriers and look forward to serving your insurance needs for many years to come. Our commitment and dedication to excellent client services has and will always remain unchanged! The professional and dedicated agency staff are willing and ready to assist you with your insurance needs.

Andy wishes to Thank You all for your past business, loyalty and support over his past 27 years as your local Farm Family representative. We look optimistically to the future and send our best Wishes to all for good health and prosperity! We also look forward to assisting you with your future insurance needs and services.

Sincerely,
Diane Daigle
A.D. Insurance LLC

(*Id.* ¶ 28.) Defendant's customers located within a fifty-mile radius of 400 Main Street, Madawaska, were among the recipients of the letter. (*Id.* ¶ 29.) After the letter was sent, the staff of A.D. Insurance and Daigle & Associates, through A.D. Insurance LLC, re-wrote certain policies of some of Defendant's customers. (*Id.* ¶ 30.)

Between September 30, 2015, and December 31, 2015, Plaintiffs converted the property and casualty insurance policies of seven of Defendant's clients who lived within 50 miles of 400 Main Street, Madawaska, from Defendant to other insurance carriers. (Defendant's Statement of Material Facts ¶¶ 16 – 17.) Plaintiffs also converted or replaced several other policies with Defendant. (*Id.* ¶ 15.)

On November 16, 2015, Defendant advised Daigle & Associates of its continuing contractual obligations and requested that Andrew Daigle and Daigle & Associates refrain from violating the terms and conditions of the Agent Contract. Defendant warned that lack of compliance could result in the forfeiture of extended earnings. (*Id.* ¶ 31.)

In the months of November and December 2015, Farm Family paid Extended Earnings to Daigle & Associates. (Statement of Stipulated Material Facts, ¶ 25.) On January 11, 2016, Defendant informed Andrew Daigle that it would no longer pay extended earnings because Daigle & Associates did not satisfy the eligibility criteria to continue to receive extended earnings. Defendant advised Mr. Daigle that he and Daigle & Associates were in breach of the Agent Contract, specifically the provisions governing ownership of business, confidentiality of information, privacy, and the restrictive covenant. (*Id.* ¶ 32.)

On June 15, 2017, Diane Daigle sold A.D. Insurance, LLC, and the office building at 400 Main Street in Madawaska to F.A. Peabody Company, a general purpose insurance

agency located in Houlton, Maine.  (*Id.* ¶ 33.)  Following F.A. Peabody's acquisition of the office building at 400 Main Street in Madawaska, Defendant, through counsel, contacted F.A. Peabody and arranged to pick up the files that had been located at the 400 Main Street office.  The files contained records of Defendant's customers previously maintained by Daigle & Associates and A.D. Insurance, LLC.  (*Id.* ¶ 35.)

According to Plaintiffs, in 2000 or 2001, Defendant's former CEO, Paul Webber, implemented a policy by which Defendant's agents were permitted to sell insurance products underwritten by other insurers when doing so would increase the total book of Defendant's business.  (McLaughlin[6] Dep. at 24:11–25, 25:18–25, 43:12–21.)  The policy was implemented based on the belief that Defendant's agents might be able to increase their business for Defendant if they were able to satisfy all of a customer's insurance needs, including needs addressed through insurance products Defendant did not offer.  (*Id.* at 24, 25.)  Based on the policy, some of Defendant's agents in Maine, including Daigle & Associates, offered insurance products from other insurers.

In 2008 or 2009, at Defendant's direction, Patrick McLaughlin and other regional supervising agents investigated the agents who had opted to write policies for other insurers.  (*Id.* at 22:2 – 23:18.)  As to Daigle & Associates, Mr. McLaughlin's report generated some concern with Defendant (i.e., "they objected to [Mr. Daigle's] answers" to some issues).  (*Id.* at 29:9 – 30:9.)  After he submitted a supplemental report, Mr.

---

[6] Patrick McLaughlin is a former supervising agent for Defendant.  He retired in 2014. (McLaughlin Dep. at 7:8.)

McLaughlin's superiors advised that everything was okay. (*Id.* at 30:11 – 31:23.) As of Mr. McLaughlin's retirement in 2014, Defendant was still honoring the approach implemented by Mr. Webber. (*Id.* at 32: 19–24.)[7]

DISCUSSION

## A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47 – 48 (1st Cir. 2011). If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986)

---

[7] These facts are based on Additional Statement of Material Facts ¶¶ 1 – 6 but draw principally on the underlying deposition transcript.

("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**B.      Analysis**

Plaintiffs assert a claim for breach of contract (count I) when Defendant ceased paying extended earnings commissions. (Complaint, ECF No. 3-2.)  Defendant maintains Plaintiffs are liable on a counterclaim for breach of contract.  Defendant's counterclaim for breach of contract includes a request for a declaratory judgment that Plaintiffs are not entitled to extended earnings commissions.  (Answer and Counterclaims, ECF No. 4.) Defendant contends summary judgment is warranted on Daigle & Associates direct claims, and on the liability issue on Defendant's counterclaim.  Based on the terms of the parties' contract, the parties agree the contract claims are governed by New York law.  Under New York law, to prevail on a breach of contract claim, a party must demonstrate the existence of a contract, the party's performance under the contract, the opposing party's breach of the contract, and resulting damages.  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

**1.      Enforceability of the Restrictive Covenants**

Before addressing the merits of the contract claims, a preliminary question is whether the restrictive covenants in this case are enforceable as a matter of public policy. Although Plaintiffs have not directly argued the restrictive covenants are unenforceable, when the applicability of a restrictive covenant is an issue, courts often assess enforceability regardless of whether a party directly raised the issue.  *Niagara Wheatfield Adm'rs Ass'n v. Niagara Wheatfield Cent. Sch. Dist.*, 44 N.Y.2d 68, 72 (1978) ("Where a

contract provision is arguably void as against public policy, that issue may be raised . . . by the court on its own motion"); *Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440, 447 (D.C. Cir. 1972) ("Invalidity of a contract offensive to public policy cannot be waived by the parties; it is a barrier 'which the court itself [is] bound to raise in the interests of the due administration of justice'") (quoting *Oscanyan v. Winchester Repeating Arms Co.*, 103 U.S. 261, 267 (1881)); 15 Timothy Murray, *Corbin on Contracts* § 79.6 (2018) ("The issue whether a contract is contrary to public policy is one that courts may address sua sponte"). An assessment of whether the restrictive covenants are enforceable under New York and Maine law is appropriate.[8]

"Under Maine law, noncompetition agreements are 'contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue.'" *OfficeMax Inc. v. Cty. Qwick Print, Inc.*, 709 F. Supp. 2d 100, 107 (D. Me. 2010) (quoting *Lord v. Lord,* 454 A.2d 830, 834 (1983). Similarly, New York law recognizes that "[u]nderlying the strict approach to enforcement of these covenants is the notion that, once the term of an employment

---

[8] When state law governs an issue before a federal district court, the forum state's choice-of-law rules apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Maine courts follow the Restatement (Second) of Conflict of Laws, under which they will enforce contractual choice of law provisions unless the chosen state has no substantial relationship to the parties or the transaction, or the application of the law of the chosen state would be contrary to a fundamental policy of a state with a materially greater interest. *Schroeder v. Rynel, Ltd., Inc.*, 1998 ME 259, ¶ 8, 720 A.2d 1164, 1166. Since overly broad restrictive covenants are void as against public policy, courts have refused to apply contractual choice of law provisions when the chosen state's law regarding restrictive covenants is significantly different than the forum state's law. *See e.g., Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 369 (2015) (refusing to apply contractual choice of law provision because the law of the chosen state, Florida, was significantly more permissive than New York law). Accordingly, the Court analyzes Maine law in order to determine whether Maine courts would apply New York law under these circumstances, or whether they would refuse to do so because it would violate Maine's strong public policy regarding restrictive covenants.

agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." *Am. Broad. Companies, Inc. v. Wolf*, 52 N.Y.2d 394, 404, 420 N.E.2d 363, 368 (1981).

Under New York law, an agreement restricting the right to compete is enforceable if the agreement is reasonable in geographic scope and duration. *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 283, 419 N.E.2d 324, 328 (1981). Where the contractual relationship is neither a contract of sale (supporting a more restrictive covenant), nor a contract of employment (calling for greater scrutiny), a "rule of reason" governs, and so long as there is a legitimate need for a protective covenant, and the geographic scope and duration are reasonable, a court will uphold the terms of the parties' contract. *DAR & Assocs.*, *Inc. v. Uniforce Servs*., *Inc*., 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999). Likewise, Maine law requires consideration of the "duration, geographic area, and the interests sought to be protected." *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995). As explained below, while the Agent Contract and Agent Commission Schedule are not technically employment contracts, the restrictive covenants here are enforceable even under such a heightened level of scrutiny.

Section 13 of the Agent Contract prohibits contact, solicitation, or otherwise interfering with the contracts of Farm Family customers within 50 miles of Plaintiffs' home and office address for two years after termination. (Statement of Stipulated Material Facts ¶ 10-d.) This restriction is rationally related to the "legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which

had been created and maintained at the employer's expense, to the employer's competitive detriment." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392, 712 N.E.2d 1220, 1225 (1999). New York courts have upheld restrictions with similar geographic and temporal limits. *See e.g., Michael G. Kessler & Assocs., Ltd. v. White*, 815 N.Y.S.2d 631, 633 (Sup. Ct. 2006) (enforcing two-year covenant); *Giller v. Harcourt Brace & Co.*, 634 N.Y.S.2d 646, 647 (Sup. Ct. 1995) (same); *Contempo Commc'ns, Inc. v. MJM Creative Servs., Inc.*, 182 A.D.2d 351, 354, 582 N.Y.S.2d 667, 669 (Sup. Ct. 1992) (same); *John G. Ullman & Assocs., Inc. v. BCK Partners, Inc.*, 139 A.D.3d 1358, 1358, 30 N.Y.S.3d 785, 786 (N.Y. App. Div. 2016) (enforcing fifty-mile covenant); *Greystone Staffing, Inc. v. Goehringer*, 836 N.Y.S.2d 485 (Sup. Ct. 2006) (same); *DAR*, 37 F. Supp. 2d 192, 197 (enforcing one-year, fifty-mile covenant).

The restriction prohibiting Plaintiffs from working with all of Defendant's clients must also be scrutinized. One court found that a covenant "was overbroad to the extent that it prohibited [the defendant] from working with *any* of plaintiffs'. . . customers, even those [the defendant] had never met, did not know about and for whom [they] had done no work." *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 370–71 (2015). New York courts, however, have repeatedly "recognized and applied the judicial power to sever and grant partial enforcement for an overbroad . . . restrictive covenant." *Id., see also Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995) ("because the reasonableness of a noncompetition agreement depends on the specific facts of the case, we assess the agreement only as Brignull has sought to apply it and not as it might have been enforced on its terms"). In this case, the undisputed record establishes that following their decision to terminate the

Agent Agreement, Plaintiffs engaged Defendant's customers with which Plaintiffs had prior direct contact while working as an agent for Defendant. The record lacks any suggestion that Defendant seeks to apply the restrictive covenant as to customers with which Plaintiffs had no contact while under contract.

Condition B(1)(f) of the Agent Commission Schedule prohibits contact, solicitation, or other interference with the contracts of Farm Family customers within fifty miles of Plaintiffs' home and office for eight years, which is the period an agent may be eligible for extended earnings commission payments. (Statement of Stipulated Material Facts ¶ 14.) In addition to those restrictions:

> The Agent shall not, during the period of this restriction, replace any policy or insurance product held by any policyholder or customer of the Company or United Farm Family with any similar policy or insurance product offered by another insurance company. If any policyholder or customer requests the Agent to replace any policy or insurance product provided by the Company or United Farm Family, the Agent shall notify the Company or United Farm Family and refer the policyholder or customer to an agent for the Company or United Farm Family.

*Id.*

While the eight-year period is relatively long for restrictive covenants, importantly, here, the restriction is not an absolute prohibition on Plaintiffs' ability to compete with Defendant. The provision restricts Plaintiffs' ability to conduct business with Defendant's customers only if Plaintiffs want to receive the extended earnings. In other words, under the contract, Plaintiffs would continue to receive commissions from Defendant after two years following Plaintiffs' termination of the contract, provided, inter alia, Plaintiffs did not "convert" Defendant's customers. Insofar as the amount Defendant was obligated to

pay as extended earnings was based on the premiums paid on the policies Plaintiffs sold, the relationship between the restriction and Plaintiffs' eligibility for the extended earnings is understandable. In addition, Plaintiffs had the choice to forfeit the extended earnings and solicit Defendant's customers after the initial two-year period elapsed. "An additional factor [New York] courts will look to in evaluating the reasonableness of a restrictive covenant is whether an employee receives continued consideration for his loyalty and good will." *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 180 (S.D.N.Y. 2006); *see also Maltby v. Harlow Meyer Savage, Inc.*, 633 N.Y.S.2d 926, 930 (Sup. Ct. 1995), aff'd, 223 A.D.2d 516, 637 N.Y.S.2d 110 (1996) ("The restrictive covenants are reasonable in that each protects the employer from severe economic injury while—at the same time— it protects the employee's livelihood"). Under the circumstances, there is no reason the extended earnings restriction should not be enforced.

In summary, given that the covenants were limited in temporal and geographic scope, and given the conduct in question occurred within the first few months of their application, the covenants are enforceable on these facts under New York law, and are not inconsistent with Maine law.

## 2. Plaintiffs' Breach of Contract Claim

Turning to the merits of the Plaintiffs' contract claim, the undisputed facts establish that Plaintiff did not satisfy the contractual prerequisites for extended earnings. Under the terms of the Agent Contract, to be eligible for extended earnings, after the termination of the contract, for Defendant's customers within a fifty-mile radius of Plaintiffs' office, Plaintiffs could not, during the eight-year period for which extended earnings would be

paid, "replace any policy or insurance product provided by [Defendant] with any similar policy or insurance product offered by another insurance company." (Agent Contract at 4, ECF No. 35-7.) Plaintiffs also could not "directly or indirectly contact or solicit any policyholder or customer of [Defendant] or induce or attempt to induce any policyholder or customer of [Defendant] to cease doing business with [Defendant]." (*Id.*)

Although Plaintiffs contend they did not solicit any of Defendant's customers, they do not challenge Defendant's contention that they replaced policies of some of Defendant's customers. Instead, Plaintiffs attempt to provide some context for the replacement of the policies. According to Plaintiffs, Mr. Daigle was undergoing cancer treatment in Colorado in September 2015 and was very ill at the time, and both he and Ms. Daigle were "in a fog" because they were "facing death." (Additional Statement ¶¶ 10 – 12.) Specifically, as to the "few policies that [Mr.] Daigle re-wrote for other companies," Ms. Daigle asserts that it was "due to clients being extremely upset with being sent to an agency so far away from Madawaska and refusing to transfer …, not because Mr. Daigle was trying to divert business from Farm Family." (*Id.* ¶ 13.) Ms. Daigle testified that she instructed employees to stop writing policies for Defendant's customers and believes she could have done so in response to a letter from Defendant, which letter she saw after returning from Colorado in October 2015. (*Id.* ¶ 15; Daigle Dep. 74:21 – 75:12.) Ms. Daigle also testified that she and Mr. Daigle believed that after termination of the contract with Defendant, the fifty-mile radius condition of the non-compete provision would be measured from the location of the nearest Farm Family agent. (Additional Statement ¶ 16.)

The concern for Mr. Daigle's health and the impact his condition had on Plaintiffs' ability to focus on business in September 2015 are understandable. Unfortunately for Plaintiffs, however, the factors do not legally excuse Plaintiffs' affirmative breach of the agreement. *World of Boxing LLC v. King*, 56 F. Supp. 3d 507, 511 – 512 (S.D.N.Y. 2014) ("Breaches of contract normally carry strict liability. However, a breach can be excused— and liability extinguished—if the breaching party can show that performance was impossible on account of a supervening event …."). Similarly, Plaintiffs' alleged good faith motive to assist customers does not constitute a justification for Plaintiffs' breach of the agreement.

Furthermore, Plaintiffs' argument that Defendant waived its ability to assert Plaintiffs' breach of the agreement is unavailing. Pursuant to the agreement, any waiver of the eligibility requirements for extended earnings must be in writing. (Agent Contract at 3.) "Where a contract provides a procedure for amending contract provisions, that procedure must be followed to execute a valid amendment." *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 411 (S.D.N.Y. 2011). The record contains no signed waiver by Defendant.

Because the undisputed record establishes that Plaintiffs did not comply with the conditions necessary to maintain their eligibility for Extended Earnings, Plaintiffs cannot prevail on their breach of contract claim. Accordingly, Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

### 3.     Defendant's Counterclaim

In Count II of its counterclaim, Defendant asks for a declaratory judgment that Plaintiffs breached their contractual obligations to Defendant and are not entitled to Extended Earnings payments.  As explained above, Plaintiffs did not comply with the conditions necessary to maintain their eligibility for Extended Earnings. Defendant thus is entitled to summary judgment on Count II of its counterclaim.

To the extent Defendant contends Plaintiffs breached the parties' agreement by selling products of other insurance companies before the fall of 2015, Defendant is not entitled to summary judgment.  The record presents factual question as to whether Plaintiffs violated Defendant's right of first refusal by giving quotes from other insurers on an equal basis with Defendant's products, or whether plaintiffs offered "best price" quotes only when Farm Family did not provide the customer's desired insurance product.  *See e.g.*, Deposition of Diane Daigle, ECF No. 46-2, 99:13-15 ("it always went to Farm Family first and quoted there, and if it didn't fit, then we would put them elsewhere").

In addition, based on Plaintiffs' testimony regarding the policy implemented by Defendant's former CEO, by which policy Plaintiffs and other agents were permitted to sell insurance products of other companies, a fact finder could reasonably conclude the parties' agreement was modified by a course of performance beginning in 2000 or 2001 and extending at least to 2014, permitting agents to sell products through other insurers. *CT Chems. (U.S.A.) v. Vinmar Impex*, 613 N.E.2d 159, 162 (N.Y. Ct. App. 1993) ("Once a contract is formed, the parties may of course change their agreement by another

agreement, by course of performance, or by conduct amounting to a waiver or estoppel").[9]

In other words, the record includes several factual disputes as to whether the parties modified their agreement and, if so, whether Plaintiffs complied with the modified agreement as to the sale of the products of other insurers.

Defendant is similarly not entitled to summary judgment on its breach of contract counterclaim based on the events in the fall of 2015. A factual issue exists as to whether the letter from Diane Daigle and A.D. Insurance constituted solicitation in violation of the two-year restrictive covenant. While the record contains evidence to the contrary, the record includes evidence from which a fact finder could infer that the letter was merely intended to inform some customers that A.D. Insurance would still be able to assist them with the insurance products that Defendant did not offer. The record is also insufficiently clear as to which customers received the letter – whether it was all of the Farm Family customers or only a subset with other insurance needs – nor is it clear whether the letter

---

[9] Plaintiffs contend Defendant is estopped from maintaining a claim that Plaintiffs breached the parties' agreement by selling products offered by other insurers. Under New York law, promissory estoppel has three elements: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Esquire Radio & Elecs. Inc. v. Montgomery Ward & Co*., 804 F.2d 787, 793 (2d Cir. 1986) (quoting Restatement (Second) of Contracts § 90 (1981)). Plaintiffs contend Defendant is estopped based on its communication with Plaintiffs in October 2014 raising concerns about Plaintiffs' compliance with the parties' agreement, and Plaintiffs' subsequent efforts to comply. At a minimum, the record contains disputed facts regarding Plaintiffs' compliance. In addition, Plaintiffs did not plead promissory estoppel in defense of Defendant's counterclaim. (Answer to Counterclaim, ECF No. 8.) "Federal Rule of Civil Procedure 8(c) requires a party to set forth a number of affirmative defenses, including estoppel, '[i]n pleading to a preceding pleading.' Affirmative defenses not set forth in pleadings are generally deemed to have been waived." *Dandurand v. Unum Life Ins. Co. of Am*., 150 F. Supp. 2d 178, 185 n.7 (D. Me. 2001) (citing *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp*., 15 F.3d 1222, 1226 (1st Cir. 1994); *Federal Deposit Ins. Co. v. Ramirez–Rivera*, 869 F.2d 624, 626 (1st Cir. 1989); *Badway v. United States*, 367 F.2d 22 (1st Cir. 1966)). Accordingly, Plaintiffs' estoppel defense does not preclude Defendant's counterclaim.

was sent before the contract was terminated and before the restrictive covenant applied, or whether it was sent after termination and while the covenant was in effect.

For the same reasons, factual questions exist as to the confidentiality clauses of the contract. The record does not unambiguously establish how Diane Daigle and A.D. Insurance acquired the contact information of some Farm Family customers before the letter was sent, and whether Plaintiffs adequately protected the records and made them available to Defendants upon termination.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant in part Defendant's Motion for Summary Judgment. (ECF No. 35/44.) Specifically, I recommend the Court enter judgment for Defendant on Count I of Plaintiffs' complaint. I also recommend the Court, pursuant to the parties' agreement, grant Plaintiffs' motion to dismiss Counts II and III of the complaint.

On Defendant's counterclaim, I recommend the Court grant Defendant's motion for summary judgment as to Count II of Defendant's counterclaim (i.e., Defendant's request for declaratory judgment). I further recommend the Court deny Defendant's motion for summary judgment on Count I of Defendant's counterclaim (i.e., that Plaintiffs breached the parties' agreement based on their handling of Defendant's records, their letter to customers upon termination, and their sale of some products of other insurers).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district

court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 19th day of December, 2018.